Donald B. Bradner v. Commissioner.
Bradner v. Commissioner
Docket No. 31673.
United States Tax Court
1952 Tax Ct. Memo LEXIS 192; 11 T.C.M. (CCH) 566; T.C.M. (RIA) 52175; June 4, 1952
*192 Randolph Paul, Esq., for the petitioner. William R. Bagby, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in income tax for the calendar year 1946 in the amount of $91,253.08. The question presented is whether the petitioner received additional compensation when he exercised an option to purchase stock from a former employer. In addition to an allegation of error concerning the stock option question, the petition also alleges error for an adjustment of "nontaxable income and additional deductions", as noted in the deficiency notice, whereby the net income for 1946 was reduced. However, the petitioner fails to pursue this allegation of error at the hearing or on brief. The deficiency notice also includes an overassessment for 1947. Findings of Fact Some of the facts are stipulated, and are so found. The petitioner is an individual temporarily residing at the Hotel duPont, Wilmington, Delaware. He filed his income tax return for the calendar year 1946 with the collector of internal revenue for the first district of Ohio. The petitioner is a chemical engineer consultant. His special *193 field is cellulose and cellulose products. He is also engaged in research on various inventions of his own. In 1924, after some 14 years of engineering work for the government and private industry, the petitioner was employed by E.I. duPont de Nemours & Company as a chemical engineer. In 1926, the duPont Company sent him to The Champion Paper & Fibre Company of Hamilton, Ohio (hereinafter referred to as Champion), to assist them in resolving a problem involving a duPont product. Not only did petitioner correct the trouble, but in so doing he developed a new process. The management of Champion was so impressed by the petitioner's work that they employed him as the organizer of a research department, and made him its first director. Petitioner was employed under an oral contract which provided for an annual salary of $10,000 plus a bonus based upon a percentage of earnings attributable to the activities of the research department. Petitioner also executed an agreement relating to the assignment of patents to Champion. In 1927 Champion offered to sell some of its capital stock to certain key employees. This offer was made available to petitioner, and he bought 100 shares of stock. *194 On June 30, 1928, petitioner entered into a written agreement with Champion. His salary was continued at $10,000 per year, but his bonus was based on a per cent of Champion's net earnings. On October 24, 1928, Champion again offered stock to the petitioner and other employees in the research department. In addition, Champion offered to assist them in financing such purchases. Petitioner purchased 300 shares of stock under this offer. The petitioner continued to work for Champion under the basic terms of the June 30, 1928, contract until it was terminated in 1935. The petitioner's minimum salary under this contract was increased to $17,000 on June 26, 1933. The petitioner received a salary of $25,000 per year from Champion, pursuant to an oral agreement, from 1935 until June 20, 1938. Petitioner had been issued approximately 35 patents for various inventions up to 1938. Many of these patents were issued on inventions made by the petitioner in connection with the products and manufacturing processes of Champion. Early in 1938 the petitioner informed the chairman of the board and the president of Champion that he was unwilling to remain with Champion unless he could acquire *195 more of an ownership in the company. Petitioner stated that, even though he liked his arrangement with Champion, he had nothing of permanent value in it, and he was not building an estate of his own. He said, if he were to remain with Champion, he must have an interest in the company. The result of these discussions was that petitioner entered into a new agreement with Champion on June 20, 1938. The contract included in its provisions an option to buy some of Champion's stock. The pertinent points of this agreement are as follows: Petitioner agreed to work for Champion for 10 years. Except for a call from the government or military service, petitioner was to render exclusive service to Champion, and further was to refrain from other employment in the paper or pulp business for a period of 5 years after leaving Champion. Champion agreed to pay petitioner a salary of $25,000 per year. As to the stock option, Champion agreed to purchase 5,000 shares of its common stock and to place these shares with an escrow agent. The conditions of purchase were as follows: "* * * On and after the 20th day of June, 1939, Brander shall be entitled to purchase 500 shares of said stock, and on and *196 after the 20th day of June of each year thereafter that Bradner remains in the employ of Champion he shall be entitled to purchase an additional 500 shares of stock, and Bradner's option with respect to all stock which he is entitled to purchase shall continue during his employment and at the termination of his employment shall continue for ninety (90) days after the date of such termination, except as provided in paragraph 7 herein. While the stock remains in escrow Bradner agrees to assign all cash dividends on same to Champion to be applied to the purchase price of said stock." The stock was to be sold to petitioner at $20 per share at any time he exercised his option. Certain adjustments were to be made for dividends and interest on the carrying charges. It was agreed that none of the stock while remaining in escrow would be voted. "6. Champion may at any time for any reason terminate Bradner's employment, but in such case and regardless of the reason for such termination, Champion shall pay Bradner at that time, in addition to any payments or benefits due him at that time, his salary for two additional years from the date of discharge, which discharge shall be in writing, *197 and give him a ninety-day option of purchasing all the above-mentioned stock remaining in escrow, at the price specified in paragraph 4 herein. "7. In the event of Bradner's death while in the employ of Champion, the executor or administrator of his estate shall have the option within one year from the date of Bradner's death, to purchase from Champion, at the price specified in paragraph 4 of this agreement, all stock remaining in escrow." If the petitioner resigned, he waived all rights to future salary and all option rights. Without endangering the petitioner's rights, Champion reserved to itself the right to purchase and deliver the stock at the time petitioner exercised his option rather than placing the entire 5,000 shares in escrow. "13. In the event that the Government should commandeer Bradner's services, Champion shall not be required to pay a salary to Bradner during the period in which he is in Government service, but Bradner shall retain all other benefits of this agreement and his salary shall be resumed as soon as he is released from Government service within the period covered by this agreement." The agreement also provided a plan whereby the petitioner could *198 borrow money from Champion to pay for the stock. On October 11, 1938, Champion's stockholders ratified this agreement between petitioner and Champion. The stockholders also voted to authorize the issuance of 5,000 additional shares of common stock and to waive their preemptive rights as to such shares. The fair market price of the stock at the time of the agreement was $19.75. Under an amendment to the 1938 agreement made on July 12, 1943, petitioner agreed to serve as consultant on the technical problems of the entire company instead of the head of its Research Department, Hamilton Division. On April 23, 1945, Champion terminated the petitioner's employment. Petitioner received $67,000.18, which was the two years' salary due him on termination. The petitioner had not acquired any stock under the option prior to April 23, 1945. Therefore, he became entitled to purchase 5,000 shares within 90 days of that date. The fair market value of the stock on April 23, 1945, was $33.50 per share. On June 5, 1945, by a resolution of its board of directors, Champion extended the period during which the petitioner could exercise his option to purchase the 5,000 shares of stock. The new closing *199 date was April 1, 1946. On February 21, 1946, the petitioner exercised his option and purchased 5,000 shares of common stock from Champion for $106,691.18. At this time, the fair market value of the stock was $47.25 per share, or an aggregate of $236,250 for the 5,000 shares. After a 2 for 1 split of Champion's stock, petitioner sold in 1946 part of the stock purchased under the option. Later, during 1947 and 1948, he sold the remaining shares. Petitioner reported for income tax purposes the difference between his purchase price and his sale price as capital gain for these years. In its 1946 return Champion reported as a capital loss deduction the amount of $39,581.92, the difference between the cost of the stock and the amount received from petitioner for the stock. Of the 5,000 shares sold to petitioner, Champion purchased 4,000 shares on the open market; the remaining 1,000 shares were treasury stock. On March 29, 1950, Champion filed a protest against the assessment of additional taxes for the year ended April 30, 1946. In the protest Champion stated its position with regard to the stock transaction, in part, as follows: "The stock which taxpayer sold to Bradner upon *200 the exercise of the option was treasury stock, which had been acquired by the taxpayer in the open market at a cost of $146,273.10. The purchase price paid by Bradner was $106,691.18. Taxpayer made no claim that the option was granted or the stock transferred as additional compensation to Bradner, which would entitle it to a deduction for compensation of $129,558.82, but treated it as an outright sale pursuant to a prior commitment, whereby it sustained a loss of $39,581.92." The stock option in the agreement of June 20, 1938, was not granted as additional compensation but solely for the purpose of permitting petitioner to acquire a proprietary interest in Champion. The difference between $106,691.18 and $236,250 was not taxable income to petitioner during the year 1946 as a result of his exercising the stock option. Opinion Respondent in his notice of deficiency stated: "(a) It is held that you received additional taxable income in the amount of $129,558.82 as compensation for personal services rendered to the Champion Paper & Fibre Company, such amount being measured by the excess of the fair market value of stock received by you in the exercise of an option granted by the *201 employer corporation over the cost to you, * * *." The petitioner contends that respondent has erred and that he did not receive compensation from Champion upon the exercise of the stock option. The tax liability resulting from the exercise of the option is dependent upon the intention of the parties at the time the option was granted. If the option were given as a consideration for services rendered, the gain resulting from the exercise of the option would be subject to income tax. , affirming Memorandum Opinion of the Tax Court [. However, if the option were not granted for compensatory purposes, but to enable petitioner to acquire a proprietary interest, the gain would not be subject to income tax upon the exercise of the option. See , reversing . Respondent relies largely on , and asserts that the decision in the Smith case must control the present situation. We do not think that the Smith case decided the issue which we now have before us. The Smith case held that when a stock option *202 was given as compensation for services, upon the exercise of that option, the employee receives taxable income in the amount that the market price exceeds the option price. We found as a fact specifically in the Smith case that the stock option was given "in consideration of services rendered by John H. Smith", and "as a reward for services rendered". However, in the present case, we are called upon to decide whether the stock option was given as compensation for personal services, or for the purpose of permitting the petitioner to acquire a proprietary interest in Champion, and we have found and hold the latter to be true. There are a number of significant criteria which determine whether stock options are compensatory. However, of these criteria those which indicate that a stock option is compensatory are noticeably absent in the instant case. The petitioner's salary was not reduced, nor were his duties or responsibilities changed in consideration of the granting of the option. . As a practical matter there was no spread between the option ( $20) price and the fair market ($19.75) value of the stock on the date the option was granted. *203 , affd., ; cf. . The option plan did not replace a prior bonus arrangement. . The petitioner did not agree to serve Champion at a fixed salary disproportionate to the value of his services. On the other hand, there is much substantial evidence to indicate that the stock option was not compensatory. The written agreement did not characterize the option as compensatory. It was not necessary for the petitioner to continue in the employ of Champion in order to exercise the option. See . Champion made no deductions on its income tax or excess profits tax returns filed for the year ended April 30, 1946, for compensation paid to the petitioner as a result of his exercising the stock option. Champion reported this transaction as a capital loss, not salary expense. This refutes a compensatory intent, cf. . During negotiations prior to the 1938 agreement petitioner explained *204 to the officers of Champion that he could not remain with them unless he acquired more of a proprietary interest in the business to which he had devoted much of his time and energy. Certainly this attitude of the petitioner is not indicative of an employee seeking an immediate salary increase. In addition there are further indications that petitioner's stock option was not compensatory. If the petitioner died while employed by Champion, his estate had the right to purchase the 5,000 shares, less any previously acquired, within one year after his death. If the government required petitioner's services, the stock option was not affected, although the petitioner's salary ceased. These clauses, together with the fact that petitioner exercised his stock option when he was no longer in the employ of Champion, indicate that petitioner's right to exercise the stock option was not dependent upon the performance of services. While we do not have sufficient evidence to establish the fact that Champion had a company policy of making it possible for key employees to purchase stock, we do have evidence that Champion did on prior occasions offer key employees the opportunity to purchase stock. *205 It appears that these offerings were not made for compensatory purposes, but rather for the purposes of giving key personnel an interest in the business. A review of the circumstances surrounding the granting of the stock option and the later exercise of the option can lead to only one conclusion. The stock option was not given as compensation for services and therefore the exercise of the option does not in itself produce a taxable gain. The determination of the respondent as to the exercise of the stock option is not sustained. Decision will be entered under Rule 50.